**FILED**

APR 13 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE HALBERT, SR., | No. C 13-2742 LHK (PR) |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |
| v. | |
| WARDEN DAVID LONG, | |
| Respondent. | |

Petitioner, a state prisoner proceeding *pro se*, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent was ordered to show cause why the petition should not be granted. Respondent has filed an answer, and petitioner has filed a traverse. Having reviewed the briefs and the underlying record, the court concludes that petitioner is not entitled to relief, and DENIES the petition.

**PROCEDURAL HISTORY**

On June 11, 2010, petitioner was sentenced to a term of 35 years to life in state prison after a jury convicted him of committing a lewd act upon a child, and it was found true that petitioner had two prior strikes. On December 1, 2011, the California Court of Appeal affirmed the judgment. On February 15, 2012, the California Supreme Court denied review. On June 25, 2012, the United States Supreme Court denied petitioner's petition for writ of certiorari. Thereafter, petitioner filed unsuccessful state habeas petitions in Superior Court, the California

Court of Appeal, and the California Supreme Court. Petitioner filed the underlying federal habeas petition on June 14, 2013.

## BACKGROUND[1]

**I.      Prosecution Evidence**

   A. <u>The Current Offense</u>

On April 19, 2009, nine-year-old Jane Doe was entering a Costco store with her parents and sister. Her father, Francisco, was behind her. Doe saw defendant leaving the store and walking toward her, carrying a cup in his left hand. When defendant was a few inches away from Doe he switched the cup to his right hand and then, as he passed, reached down with his left hand and grabbed and squeezed Doe's buttocks.

Doe was in shock and walked a few more steps when she heard her father get mad. Defendant tried to leave, but Francisco would not let him.

Francisco testified that he was three or four feet behind Doe as they approached the store's entrance. He saw defendant approach Doe, transfer his cup from his left hand to his right, swing his left hand back and grab and squeeze Doe's bottom.

Francisco stepped in front of defendant and angrily confronted him. Defendant did not respond at first, but then he walked over to Doe and said something to her. Doe looked scared. Another customer called the police while Francisco prevented defendant from leaving. Defendant unlocked his bicycle and tried to ride away, but Francisco grabbed the bike. Defendant then got off the bike and tried to walk away, but a customer and the store manager stopped him.

Concord Police Officer Lisa Capocci arrived and spoke separately to Francisco, Doe, and Doe's mother and sister. Doe said that defendant touched her on the buttocks as he walked past her, and she applied pressure on Officer Capocci's arm to show how defendant had touched her. Doe was trembling and holding back tears during the interview.

   B. <u>The Prior Offenses</u>

Defendant was convicted of sexual offenses in 1978, 1980, and 1989. Two of the prior victims testified about the offenses.

In 1978, 11-year-old J.G. was walking home from school. She was wearing her school uniform over gym shorts. Defendant drove by her on a motorcycle, pulled onto the sidewalk and stopped in J.G.'s path. He said his motorcycle had broken down and asked J.G. to help him by holding a button near the ignition. She complied, and bent down to press the button. Defendant moved behind her, put one arm around her waist, reached underneath her skirt and fondled her genitalia over her shorts. J.G. was very scared, started to cry and told him to stop.

---

[1] The following facts are taken from the California Court of Appeal's opinion.

After a couple of minutes defendant stopped and rode away. J.G. ran home and told her parents what had happened. The incident resulted in defendant's guilty plea to engaging in lewd conduct in a public place.

In 1980, 15-year-old S.F. was walking home from school when defendant, her father's neighbor, drove up and offered her a ride. She accepted and they drove around, eventually ending up in a deserted hilly area where defendant stopped the car, said he had run out of gas, and left to call a friend for help. When he returned they sat and waited for the friend. After about 45 minutes, defendant threatened S.F., forced her to orally copulate him, raped her, and masturbated with her bra. S.F. eventually escaped and ran to a nearby house for help.

S.F. testified that she always looked young for her age and that she still looked like a child when she was 15. The jury was shown a photograph of S.F. at that age. Defendant entered a guilty plea to forcible rape.

In addition to the testimony of J.G. and S.F., the parties stipulated that in 1989 defendant pleaded guilty to rape and annoying or molesting a child based on a 1987 incident involving G.F.

## II. Defense Case

John Valentine was entering the Costco store when he saw the confrontation between Francisco and defendant. He saw Francisco raise his right hand, stick it in defendant's face and say, "Why did you do that?" Defendant looked dumbfounded and did not respond. Francisco said, "You touched my daughter" in a loud and confrontational voice. Francisco's two daughters were looking at him with incredulous expressions.

Defendant testified that he was at Costco to get something to eat. As he left the store he was carrying a soda in his left hand and his sunglasses in his right. He was preoccupied, and did not notice Jane Doe or her family as he was leaving. He moved the soda to his right hand so he could retrieve his bike keys from his left hip, where he thought they were clipped to a belt loop. However, as he reached for his keys he felt them in his right pocket, so he dropped his left hand to his left side in order to switch the soda and his glasses to his left hand. He felt the back of his pinky and ring finger hit something, but he thought it was his own leg.

At that point a man approached him speaking in a loud and angry voice. The man asked defendant why he did that and said something like "she's only eight." Defendant responded to him, also with a raised voice, and then turned to Doe and asked her if he had touched her. Doe looked scared.

Defendant walked to his bike, with Doe's father following him. He briefly attempted to leave on his bike because he was scared, but then he realized that leaving was a bad decision and decided to stay. Doe's father waited next to him until the police arrived.

Defendant admitted that he told police he did not touch Doe, but he said he only meant he did not touch her with sexual intent. He admitted that he is sexually attracted to young girls. He admitted that he molested J.G. and forcibly raped S.F., and that in both cases he was unable to resist his sexual urges. In 1987, when he was 29, defendant picked up 15-year-old hitchhiker,

G.F., took her to a motel room, and forcibly raped her.

*People v. Halbert*, No. A128895, 2011 WL 6000868, at *1-*2 (Cal. App. Dec. 1, 2011).

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, the application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412. Clearly established federal law is defined as "the governing legal principle

or principles set forth by the Supreme Court." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, however, only the Supreme Court's holdings are binding on the state courts, and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

## DISCUSSION

Petitioner raises the following claims in his petition: (1) the trial court erred in failing to grant a mistrial or a new jury panel due to a prospective juror's statement of bias in open court; (2) the trial court's placement of a uniformed deputy next to petitioner during petitioner's testimony violated petitioner's right to a fair trial; (3) counsel rendered ineffective assistance by: (a) failing to conduct a reasonable pre-trial investigation, (b) failing to investigate a potentially meritorious defense, (c) failing to call character witnesses, (d) failing to call expert witnesses; and (e) counsel's assistance was so ineffective that it was presumptively prejudicial; and (4) the cumulative errors prejudiced petitioner.

I. <u>Juror bias</u>

During voir dire, Juror No. 18 admitted that he had conducted internet research on petitioner prior to voir dire. Petitioner claims that Juror No. 18 made statements that tainted the jury panel. Petitioner moved for a new jury panel, but the motion was denied. Petitioner argues that the trial court's failure to dismiss the jury panel violated petitioner's right to a fair and impartial jury trial.

The California Court of Appeal considered the claim and rejected it. It summarized the proceedings and analyzed the claim as follows:

 A. <u>Background</u>

  Early in jury selection, before the court had provided any admonitions to prospective jurors, the court asked a potential juror whether his acquaintance with a retired sheriff's deputy would prevent him from being fair. The following discussion ensued:

  "POTENTIAL JUROR: No. But I'm not sure I'll be fair in this particular case.

  THE COURT: Okay. Can you tell me why?

POTENTIAL JUROR: Background.

THE COURT: When you say background, what do you mean?

POTENTIAL JUROR: The defendant's background.

THE COURT: Okay. Well, do you know anything about the defendant's background?

POTENTIAL JUROR: Yes.

THE COURT: Do you know the defendant?

POTENTIAL JUROR: No.

THE COURT: Okay. How is it that you know something about the defendant's background?

POTENTIAL JUROR: Internet.

THE COURT: You looked it up?

POTENTIAL JUROR: Yup."

At that point the court admonished the prospective jurors that they should not do any independent investigation. It then continued:

"THE COURT: Okay. Mr. Henderson, I want to ask you a couple of questions. [¶] If I gave you an instruction that you are to disregard anything that you found on the internet if you're seated as a juror, and that you're only to consider the evidence that comes in to you through the vehicle of this trial, could you follow that?

POTENTIAL JUROR: Yes.

THE COURT: You could follow that. And do you think if you could follow that, that you could sit as a fair and impartial juror on this case?

POTENTIAL JUROR: I'm not sure."

Outside the presence of the jury panel, defense counsel argued that these answers had tainted the other prospective jurors and asked the court to declare a mistrial and convene a new jury panel. The court denied the motion and stated four reasons for its ruling. "Number one, the jury did not get instructed not to look it up on the internet or do any investigation, so he didn't contravene a specific instruction by the Court. [¶] Number two, the [jury] questionnaire does imply prior convictions. Although we say it's not evidence, that it's not the first time that that idea has been explicitly given to the jury, and by questionnaire that was by agreement of counsel. [¶] And, number three, I would note that prior convictions are coming [in] in this trial anyway, so there's going to be something in front of the jury. [¶] And, number four, I'm not ruling on the challenge for cause, but I did say – I did ask him, you know, could you follow the instructions and only take the evidence that you take through the vehicle of the trial and he said he would."

>Defendant eventually exercised a peremptory challenge to dismiss the juror.
>
>B. <u>Analysis</u>
>
>"[D]ischarging the entire venire is a remedy that should be reserved for the most serious occasions of demonstrated bias or prejudice, where interrogation and removal of the offending venirepersons would be insufficient protection for the defendant," and the trial court has broad discretion to determine whether or not possible bias or prejudice against the defendant has so severely contaminated the entire venire that its discharge is required. (*People v. Medina* (1990) 51 Cal.3d 870, 889, 274 Cal.Rptr. 849, 799 P.2d 1282.) Accordingly, we review the denial of defendant's motion for mistrial and a new jury panel under the abuse of discretion standard. (*People v. Woodberry* (1970) 10 Cal. App. 3d 695, 708, 89 Cal.Rptr. 330; *People v. Nguyen* (1994) 23 Cal. App. 4th 32, 41, 28 Cal.Rptr.2d 140.)
>
>Defendant contends the prospective juror's comments about his internet research required discharge of the entire jury panel because the other jurors were "left to speculate as to what this horrific information was that made juror no. 18 unable to be fair despite repeated inquiries by the trial court." The court reasonably rejected that contention. The prospective juror gave no specifics about what he found in his research, nothing he said was particularly inflammatory, and he was ultimately dismissed by peremptory challenge. This was simply not one of the "most serious occasions of demonstrated bias or prejudice" that would require dismissal of the entire venire. (*People v. Medina*, supra, 51 Cal.3d at pp. 888-889, 274 Cal.Rptr. 849, 799 P.2d 1282 [prospective jurors made statements such as "even his own lawyers think he's guilty," and "they ought to have [sic] him and get it over with" in front of other jurors; dismissal of venire not required]; *see also People v. Nguyen*, supra, 23 Cal. App. 4th at p. 41, 28 Cal.Rptr.2d 140 [prospective juror stated he might fear retaliation because defendant was from same ethnic group; court properly denied motion to dismiss venire].) Moreover, the prospective juror's vague comments about defendant's "background" could not conceivably have been prejudicial in light of the details about defendant's prior offenses that were admitted into evidence at trial.

*Halbert*, 2011 WL 6000868, at *4-*5.

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. *Id.* In addition, the Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence presented at trial. *See Turner v. Louisiana*, 379 U.S.

466, 472-73 (1965). However, a petitioner is entitled to habeas relief only if it can be established that the exposure to extrinsic evidence had "'substantial and injurious effect or influence in determining the jury's verdict.'" *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). In other words, the error must result in "actual prejudice." *See Brecht*, 507 U.S. at 637.

Evidence not presented at trial is deemed "extrinsic." *See Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987). Jury exposure to extrinsic evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment. *See Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995). Several factors are relevant in determining whether the alleged introduction of extrinsic evidence constitutes reversible error:

> (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of . . . whether the introduction of extrinsic material [substantially and injuriously] affected the verdict.

*Smith v. Swarthout*, 742 F.3d 885, 894 (9th Cir. 2014) (citation omitted).

Here, the extrinsic material was "actually received" when Juror No. 18 stated in open court that he had conducted internet research on petitioner and read about petitioner's "background." The length of time this extrinsic material was available to the jury appears to be minimal. Once Juror No. 18 stated he had learned about petitioner's background, the court asked follow up questions about whether Juror No. 18 could ignore what he learned on the internet and follow the court's instructions. Moreover, the record does not demonstrate that any further discussion was had regarding what Juror No. 18 learned, or that other jurors had commented on or discussed what Juror No. 18 learned. In addition, the extrinsic material was introduced before a jury was even selected, and Juror No. 18 was ultimately excused from the jury pool. Finally, the extrinsic material was so vague and general that its potential effect on the jury's impartiality is not inherently prejudicial.

Moreover, even if it was erroneous not to replace the entire jury pool, petitioner has not demonstrated that the error had a substantial or injurious effect of influence on the jury's verdict.

*See Brecht*, 507 U.S. at 638. As the state court observed, the jury ultimately learned about petitioner's prior convictions, and the trial court instructed the jury to rely only on the evidence at trial to determine its verdict.

Accordingly, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

II.   Presence of uniformed deputy during petitioner's testimony

When petitioner testified at trial, a uniformed deputy accompanied him to the witness stand and was positioned next to petitioner during petitioner's testimony. Petitioner claims that the deputy's presence next to petitioner violated petitioner's right to a fair trial.

At trial, defense counsel objected to the deputy's presence, arguing that it would cast doubt on petitioner's credibility and was prejudicial. In response, the trial court stated that it believed the presence of a deputy was appropriate "given that [defendant] has felony convictions involving crimes with a forcible nature to them and a violence upon vulnerable victims under a certain age and including [an] enhancement with use of a knife. [¶] So based on that record, I think it's just a good precaution for the courtroom. And if you wish, I can admonish the jury that they may have noticed the bailiff is standing there and that they shouldn't take this to be any particular reflection in terms of the credibility of the defendant." *Halbert*, 2011 WL 6000868, at *7. Indeed, the trial court did instruct the jury not to interpret the bailiff's presence as an indication of defendant's credibility. *Id.*

The California Court of Appeal rejected petitioner's claim. It concluded that the trial court had the discretion to determine whether the security measure of stationing a guard at or near the witness stand outweighed potential prejudice to a testifying defendant. *Id.* at *8. The appellate court recognized that the trial court specifically explained its decision to use a uniformed deputy during petitioner's testimony. *Id.* Further, the trial court took the additional, though not required, step of admonishing the jury not to draw inferences from the deputy's presence. *Id.*

Courtroom security arrangements at trial may be so prejudicial as to deprive a criminal defendant of a fair trial in violation of due process. *See Holbrook v. Flynn*, 475 U.S. 560, 569

1  (1986)). "To be sure, it is possible that the sight of a security force within the courtroom might
2  under certain conditions 'create the impression in the minds of the jury that the defendant is
3  dangerous and untrustworthy.'" *Id.* (citations omitted). A federal court's review of security
4  arrangements is very limited, however. *Ainsworth v. Calderon*, 138 F.3d 787, 797 (9th Cir.),
5  *amended by* 152 F.3d 1223 (1998). All it may do is look at the scene presented to the jurors and
6  determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat
7  to the defendant's right to a fair trial. *See id.* If the challenged practice is not found inherently
8  prejudicial, and if the defendant fails to show actual prejudice, the inquiry is over. *Id.*

9  As noted, this court's review is limited to the scene presented to the jurors and
10 determining if it was so inherently prejudicial that it deprived petitioner of a fair trial. Here, the
11 mere presence of one uniformed deputy behind petitioner as he testified was not inherently
12 prejudicial. *See, e.g., Holbrook*, 475 U.S. at 569 (presence of four uniformed state troopers did
13 not unconstitutionally deprive defendant of a fair trial); *Williams v. Woodford*, 384 F.3d 567,
14 587-89 (9th Cir. 2004) (presence of four uniformed marshals and several other "plain-clothed"
15 guards at trial not inherently prejudicial; defense counsel's statements implying that security
16 measures were extraordinary did not support a claim that the security measures at trial
17 undermined the presumption of innocence). Moreover, petitioner has not demonstrated actual
18 prejudice from the deputy's presence during petitioner's testimony. The trial court provided
19 appropriate admonishments to the jury regarding the presence of the deputy, stating that the jury
20 should not interpret the deputy's presence in any manner.

21 Accordingly, the state court's rejection of this claim was not contrary to, or an
22 unreasonable application of, clearly established Supreme Court law.

23 III. <u>Ineffective assistance of counsel</u>

24 Petitioner alleges that counsel rendered ineffective assistance by: (a) failing to prepare
25 for trial, (b) failing to investigate a potentially meritorious defense, (c) failing to call character
26 witnesses, and (d) failing to call expert witnesses. Petitioner further claims that because
27 counsel's representation was so ineffective, prejudice should be presumed.

28 As an initial matter, the court will first address petitioner's argument that prejudice

should be presumed. A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Normally, in order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Here, petitioner alleges that counsel's ineffective assistance was so egregious, that her representation was presumptively inadequate. Where counsel's conduct is egregiously prejudicial, no showing that there is a reasonable probability that the outcome would have been different is required, and both prejudice and ineffective assistance are presumed. *United States v. Cronic*, 466 U.S. 648, 658-62 (1984). These will be those rare cases where counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." *Id.* at 659. In *Cronic*, the Supreme Court discussed three "circumstances [involving a defendant's counsel] that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *See id.* at 658. The Supreme Court later summarized those three circumstances as follows:

> First and most obvious was the complete denial of counsel. A trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at a critical stage, a phrase we used in [two prior cases] to denote a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused. Second, we posited that a similar presumption was warranted if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. Finally, we said that in cases like *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected.

*Bell v. Cone*, 535 U.S. 685, 696-97 (2002) (internal quotations, citations, alterations and footnote omitted).

Petitioner points to no authority suggesting that his allegations of error are subject to *Cronic* analysis. He does not allege that he was denied the presence of counsel at a critical stage. Nor does he claim that counsel was called upon to render assistance under circumstances where competent counsel could not. Trial counsel also did not "entirely fail[] to subject the prosecution's case to meaningful adversarial testing," *see Bell*, 535 U.S. at 696, as evidenced by trial counsel's having cross-examined witnesses called by the prosecution, offered petitioner's testimony in the defense case, and made both an opening statement and a closing argument.

Accordingly, the court will use *Strickland* to analyze each of petitioner's ineffective assistance of counsel claims.

A. <u>Pre-trial preparation</u>

Petitioner argues that counsel failed to adequately prepare him to testify at trial. Petitioner alleges that counsel would visit him for approximately 15-20 minutes at a time, and they would rarely discuss specific things such as trial strategy or testimony. After trial started, petitioner states that counsel had promised to visit him to discuss petitioner's testimony, but counsel never did so. On the day petitioner was to testify, counsel asked him if he was ready, and petitioner believed he had no choice, so he responded, "I guess so." As a result, alleges petitioner, petitioner was unprepared for the prosecutor's questions.

"Adequate consultation between attorney and client is an essential element of competent representation of a criminal defendant." *Summerlin v. Schriro*, 427 F.3d 623, 633 (9th Cir. 2005) (quoting *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983)). "While the amount of consultation required will depend on the facts of each case, the consultation should be sufficient to determine all legally relevant information known to the defendant." *Tucker*, 716 F.2d at 581-82.

Here, petitioner does not specify what counsel should have done to adequately prepare petitioner to testify or explain how counsel's preparation was unreasonable. The only specific complaint petitioner gives is that petitioner was unprepared for the prosecution's question about whether petitioner was attracted to young girls.

PROSECUTOR:     Fair to say that you're attracted to young girls?

| | | |
|---|---|---|
| 1 | PETITIONER: | I have an attraction to young girls, yes. |
| 2 | PROSECUTOR: | And by young girls I mean 15 and under, correct? |
| 3 | PETITIONER: | Correct. |

(Resp. Ex. L, RT 559.) Petitioner asserts that had trial counsel adequately prepared him to testify, petitioner could have explained that it had been many years since he engaged in such "abhorrent behavior." (Traverse at 12.) Petitioner further argues that, based on counsel experience, she could have prepared a more appropriate response. (*Id.*) However, even if counsel had prepared petitioner for these particular questions, petitioner still would have had to answer truthfully, and in the affirmative, regardless of whether petitioner subsequently explained that it had been "many years" since he was convicted of sexual offenses with young girls.

Regarding deficient performance, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. The test is not whether another lawyer, with the benefit of hindsight, would have acted differently, but whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Here, counsel's preparation of petitioner to testify does not appear to be unreasonable. Evidence of petitioner's two prior forcible rape convictions with young girl victims and one prior molestation conviction with a young girl victim were admitted at trial. During the prosecution's case-in-chief, two of the female victims testified about these prior convictions. Counsel's decision to allow petitioner to testify that he was attracted to young girls was reasonable considering that the jury would have already made that inference based on petitioner's prior convictions. In light of petitioner's prior convictions against other young girls, counsel could have reasonably decided that petitioner's unqualified and forthcoming admissions about his attraction to, and prior sexual offenses against, young girls could restore petitioner's credibility when he then testified that with respect to Jane Doe, petitioner had no intention of touching her at all, much less with any sexual intent. Petitioner has not provided evidence that counsel's performance fell below an objective standard of reasonableness. In the absence of evidence that counsel gave constitutionally inadequate advice, petitioner cannot overcome the presumption that counsel's conduct was within the range of reasonable professional advice. *See*

*Burt v. Titlow*, 134 S. Ct 10, 17 (2013) (concluding that without any evidence demonstrating that counsel gave inadequate advice regarding withdrawal of a guilty plea, there is strong presumption that counsel's performance was not deficient).

  Moreover, petitioner has not set forth any facts that would support a finding that counsel's failure to adequately prepare petitioner to testify impacted the outcome of trial. At trial, in addition to the two young female victims' testimonies about petitioner's prior convictions, petitioner also testified in detail about the two prior forcible rape convictions with the young girl victims and the prior molestation conviction with a young girl victim. Petitioner admitted on direct examination that the molestation and forcible rape victims did not consent to his touching, and that he knew that the girls were young. Even without petitioner's admission that he was attracted to young girls, these testimonies plainly gave rise to an inference that petitioner was in fact attracted to young girls. In addition, both Jane Doe and her father testified that petitioner squeezed her buttocks with his hand. Despite petitioner's testimony that he accidentally brushed Jane Doe's buttocks with his fingers, there is no reasonable probability that counsel's alleged deficient preparation of petitioner prior to his testimony affected the outcome of trial. Thus, petitioner has not shown that he was prejudiced by the alleged inadequate consultation. *See, e.g., Anderson v. Calderon*, 232 F.3d 1053, 1086 (9th Cir. 2000) (holding that petitioner did not demonstrate prejudice under *Strickland* where he made only "generalized boilerplate claims of harm to the attorney-client relationship" due to lack of pre-trial consultation with counsel and failed "to identify any specific way in which his decisions [regarding pleas or strategies] or defense would have differed" had counsel met personally with petitioner), *overruled on other grounds by Osband v. Woodford*, 290 F.3d 1036, 1043 (9th Cir. 2002); *United States v. Mealy*, 851 F.2d 890, 908-09 (7th Cir. 1988) ("[Defendant] fails to explain how the lack of consultation affected the outcome of the trial. [Defendant's] conclusory allegations regarding the time spent in consultation with his trial counsel do not show that he was prejudiced at trial, and thus his ineffective assistance of counsel claim must fail.").

  Thus, petitioner has not demonstrated that counsel's representation was deficient, or that petitioner was prejudiced by counsel's failure to adequately prepare petitioner to testify.

B.   Investigation of potential defense

Petitioner claims that counsel rendered ineffective assistance when she failed to investigate petitioner's chronic medical issues. Specifically, petitioner states that he informed counsel that he had chronic arthritis in his hips and suffered from back issues. Petitioner argues that these ailments could have been used to suggest that petitioner's medical issues, combined with his height of 6 feet tall made it unlikely that he could "contort[]" his body to touch Jane Doe's buttocks when she was 4 feet, 9 inches tall. (Pet. Memo. at F.) Petitioner states that he informed counsel about his medical ailments, including his previous back and knee surgeries. Petitioner later asked counsel whether his medical ailments would be beneficial to his defense, and counsel responded that she would not "be going that route," and that it was "out of the question." (Pet. at 30.) At the time, petitioner believed that part of counsel's trial strategy was not to raise the issue of petitioner's medical incapacity. (*Id.*) However, now, petitioner argues that counsel was ineffective for failing to investigate this potentially meritorious defense.

Courts must afford tactical decisions by trial counsel considerable deference because there is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Harrington v. Richter*, 562 U.S. 86, 109 (2011); *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) ("There comes a point where a defense attorney will reasonably decide that another strategy is in order, thus making particular investigations unnecessary," and "those decisions are due a heavy measure of deference").

Here, as respondent points out, there is no evidence that counsel failed to investigate the possibility of using petitioner's medical ailments as a defense. Petitioner's own statements, combined with the strong presumption that counsel reasonably excluded the idea of a defense based on petitioner's medical issues, lead to a conclusion that counsel's decision to bypass such a defense was a tactical decision. *See Richter*, 562 U.S. at 109. Petitioner's medical records do not demonstrate that petitioner was unable to grab Jane Doe's buttocks. At most, petitioner's medical records show that petitioner had previous back and knee problems, but not that he had a physical inability to commit the crime.

Thus, petitioner has not demonstrated that counsel's failure to investigate his medical

ailments further was deficient. For the same reasons, petitioner also has not shown that he was prejudiced by counsel's failure to pursue this theory of defense.

### C. Potential witnesses

Petitioner claims that counsel was ineffective because she failed to call Alec Maguire and Mike Shannon, both of whom worked with petitioner, as character witnesses to testify about petitioner's good character, work performance, physical abilities, and extracurricular projects on which petitioner had been working. Specifically, petitioner alleges that both witnesses would have testified that two days before the crime, petitioner and the witnesses were talking about how petitioner's extracurricular activities were "taking too long," and petitioner needed to finish them quickly. Petitioner argues that their testimonies would have corroborated petitioner's testimony that petitioner was distracted on the day he touched Jane Doe's buttocks and therefore had no specific intent to commit the crime.

However, petitioner has not presented any evidence of counsel's investigation, lack of investigation, or her reasons for failing to call these witnesses to testify. Petitioner admits that counsel had spoken with Maguire, that petitioner and counsel discussed the benefits of Maguire's testimony, and that Maguire and Shannon's names were on the potential witness list that was read at voir dire. Keeping in mind the strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect," *see Harrington v. Richter*, 131 S. Ct. 770, 790 (2011), and based on the lack of evidence as to why counsel did not call these witnesses to testify, the court cannot say that counsel's decision not to call Maguire or Shannon was unreasonable. *See, e.g., Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999) (recognizing that if a lawyer has interviewed a potential witness, the decision to put that witness on the stand is entitled to deference because "[f]ew decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial.").

More importantly, where a petitioner bases an ineffective assistance of counsel claim on the failure to interview or call a particular witness, the petitioner must identify the witness and allege what the witness's testimony would have been and how it might have changed the outcome of the proceeding. *See Dows v. Wood*, 211 F.3d 480, 486-87 (9th Cir. 2000). The

petitioner must also show that the witness was available at the time of trial and willing to testify. *See United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988); *see also Chafford v. Hedgpeth*, No. 09-cv-01574 PJH, 2013 WL 791320, at *3 (N.D. Cal. Mar. 4, 2013) ("Where there is no evidence that an individual will testify at trial, defense counsel's failure to call the witness does not constitute ineffective assistance of counsel."). Petitioner does not satisfy these requirements. Petitioner has not shown that either witness was available or willing to testify, nor has he submitted affidavits from either witness as to the substance of the proposed testimony.

For these reasons, petitioner has failed to show that counsel was deficient for not calling Alec Maguire and Mike Shannon as witnesses, and petitioner has failed to show that he was prejudiced.

D. Expert witness

Petitioner alleges that counsel was ineffective because she failed to have psychiatric expert witness Dr. Raymond E. Anderson evaluate petitioner and testify about Dr. Anderson's 2005 18-page evaluation of petitioner that Dr. Anderson conducted for purposes of petitioner's 2006 Sexually Violent Predator ("SVP") trial. (Pet. Memo., Ex. B.) Petitioner claims that Dr. Anderson would have opined that petitioner had matured and would have helped the jury believe that petitioner's touching of Jane Doe was accidental. Petitioner states that counsel received a copy of the 18-page evaluation, but dismissed it as "too technical."

Expert testimony is necessary when lay persons are unable to make an informed judgment without the benefit of such testimony. *See Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999). Where the evidence does not warrant it, the failure to call an expert does not amount to ineffective assistance of counsel. *See Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (stating that a decision not to pursue testimony by a psychiatric expert is not unreasonable when the evidence does not raise the possibility of a strong mental state defense).

Here, petitioner states that it was necessary for the jury to see the 2005 evaluation so that the jury could "ascertain the intent" of petitioner's touching of Jane Doe's buttocks. However, there is no evidence to suggest that counsel did not review the evaluation and, in her reasonable judgment, reject its usefulness. *See Richter*, 562 U.S. at 109. Moreover, a review of Dr.

1  Anderson's evaluation shows that four years prior to the underlying crime, Dr. Anderson
2  concluded that, based on his examination, petitioner was not predisposed to commit sexually
3  violent offenses or engage in sexually predatory behavior. Dr. Anderson conceded, however,
4  that although the purpose of the evaluation was to predict the probability that petitioner would
5  commit another sexually violent act, "psychologists and psychiatrists are not particularly
6  knowledgeable, accurate or precise in making such predictions." (Pet. Mem., Ex. B.) While the
7  evaluation does provide an expert's opinion that petitioner does not suffer from a mental disease
8  such that he is predisposed to commit a sexually violent offense, Dr. Anderson could not have
9  stated or given an opinion on whether petitioner possessed the requisite specific intent at the time
10 of the crime. *See* Cal. Penal Code § 29 ("In the guilt phase of a criminal action, any expert
11 testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as
12 to whether the defendant had or did not have the required mental states, which include, but are
13 not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged."). In
14 addition, it was reasonable for counsel not to call Dr. Anderson to the stand because, had counsel
15 done so, it would have "opened the door" for the prosecution to call an expert who could have
16 opined that, in his or her opinion, petitioner was still a sexually violent predator who was
17 predisposed to engaging in sexually violent behavior.

18     Finally, it is unclear how Dr. Anderson's opinion and 2005 evaluation that petitioner did
19 not suffer from a sexual disorder would have changed the jury's mind that petitioner had the
20 specific intent to touch Jane Doe's buttocks. Dr. Anderson's examination was created for the
21 purpose of determining whether petitioner fit the definition of a "sexually violent predator,"
22 which includes having a "diagnosed mental disorder that makes the person a danger to the health
23 and safety of others in that it is likely that he or she will engage in sexually violent criminal
24 behavior." Cal. Welf. & Inst. § 6600(a)(1). A "diagnosed mental disorder includes a congenital
25 or acquired condition affecting the emotional or volitional capacity that predisposes the person to
26 the commission of criminal sexual acts in a degree constituting the person a menace to the health
27 and safety of others." *Id.* at § 6600(c). In other words, evidence that petitioner was not suffering
28 from a mental disorder in which he was predisposed to engaging in sexually violent criminal

behavior does not exclude the jury from finding that petitioner did not or could not form the specific intent to touch Jane Doe's buttocks. For these reasons, petitioner has failed to show that counsel was deficient for not calling an expert witness, nor has petitioner shown that he was prejudiced by counsel's failure to do so.

Accordingly, the state court's rejection of petitioner's ineffective assistance of counsel claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

IV.   Cumulative errors

Petitioner's last claim is that he is entitled to habeas relief based on the cumulative effect of the alleged state court errors. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *See, e.g., Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). However, where no single constitutional error exists, as here, nothing can accumulate to the level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

## CONCLUSION

The petition for writ of habeas corpus is DENIED. The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

The Clerk is instructed to enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

DATED: 4/13/2015

LUCY H. KOH
United States District Judge